NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

_____

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 03-23717 |
| IAN M WATSON MCLAUGHLIN | : | Chapter 7 |
| Debtor. | : | |
| ALBERT RUSSO, Trustee | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 03-2930 |
| IAN M. WATSON MCLAUGHLIN and MARY MCLAUGHLIN | : | |
| | : | **MEMORANDUM OPINION** |
| Defendants | : | **Trial Dates: 6/21/05, 6/29/05 & 7/26/05** |

_____

**APPEARANCES**

Michael McLaughlin, Esquire
Wasserman, Jurista & Stolz, P.C.
225 Millburn Avenue - Suite 207
PO Box 1029
Millburn, New Jersey 07041
Attorney for Albert Russo, Esquire, Chapter 7 Trustee/Plaintiff

Paul Pflumm, Esquire
Middlebrooks Shapiro Nachbar & Pflumm, P.C.
140 Eagle Rock Avenue
Roseland, New Jersey 07068-0609
Attorney for Defendant, Mary McLaughlin

The Honorable Kathryn C. Ferguson, USBJ

On December 16, 2003, the Trustee filed a five count complaint against Ian McLaughlin and Mary McLaughlin. Defendant Mary McLaughlin filed a Counterclaim on February 5, 2004, which was later resolved on motion for summary judgment. The Complaint sought to avoid pre-petition transfers that occurred pursuant to a pre-petition Property Settlement Agreement ("PSA"). Counts One and Two of the Complaint sought to avoid the transfers as fraudulent pursuant to § 548 of the Bankruptcy Code, while Counts Three and Four relied on the New Jersey Fraudulent Transfer Act. The final count sought authorization to sell property pursuant to 11 U.S.C. § 363(h).

The Trustee filed a motion for summary judgment in November 2004, and Mary McLaughlin cross-moved for summary judgment on her Counterclaim. After a hearing on January 10, 2005, the court granted the motions in part and denied the motions in part. Counts One and Four of the Complaint alleged that the PSA was constructively fraudulent pursuant to § 548(a)(1)(B) and N.J.S.A. 25:2-27(a). The court denied summary judgment on those Counts because it found that a determination of whether Mary McLaughlin received reasonably equivalent value turned on establishing the likely range of distribution that would have been awarded by the matrimonial court in a contested divorce proceeding. Counts Two and Three alleged actual fraud pursuant to N.J.S.A. 25:2-25(a) and § 548(a)(1)(A). The court denied summary judgment on those Counts for two reasons: 1) that issues of intent should rarely be decided on summary judgment; and 2) that one of the most crucial badges of fraud had not been established - lack of reasonably equivalent value. As a result, the testimony at trial focused largely on what might have been awarded to Mary McLaughlin in the matrimonial proceeding.

The trial of this adversary proceeding commenced on June 21, 2005, and concluded on July 26,

2005. The court permitted the parties to submit written summations, which they filed in August 2005.

## Factual Background

Ian McLaughlin and Mary McLaughlin were married on September 17, 1977. At the time of the marriage, Mr. McLaughlin had graduated from Harvard University. Mary had left college before receiving her undergraduate degree. Soon after they married the couple had twin boys. Three years later, another son was born to the marriage. Mary McLaughlin did not work outside the home during the marriage.

In 1981, the McLaughlin family moved to New Jersey and purchased a nine bedroom home on a ten acre lot in Peapack-Gladstone ("61 Highland Avenue"). The property included a pool and pool house as well as a barn with stables. Not longer after, additional vacant land across the street was purchased to expand the property ("60 Highland Avenue"). The couple also had a vacation home in Nantucket that they sold in 2002. The properties were all held as tenancies by the entirety. The couple enjoyed a lavish lifestyle, including full-time servants, travel abroad, country club membership, and private schools for their children.

During most of the marriage Ian McLaughlin had a substantial income as a private businessman. His annual income varied greatly but ranged as high as $2,400,449 in 1997. After 1998, Ian McLaughlin's income dropped significantly. Due to K-1 business losses, in 1999 Ian McLaughlin had an adjusted income of -$478,804. In 2000, his total income was $175,000 before deducting losses.

In 2000, the McLaughlins received tax refunds from joint tax filings from the 1997 and 1999 tax years totaling $321,000. Ian McLaughlin received and used these funds, but there are no documents to verify the nature of their use.

Mary McLaughlin filed for divorce on January 29, 2001. Mr. McLaughlin filed his Answer and

3

Counterclaim on May 25, 2001. A Somerset County Superior Court Judge entered an Order on January 18, 2002 awarding Mary McLaughlin *pendente lite* support, including car expenses, medical expenses for Mary McLaughlin and the children, the children's educational expenses, and $1,279.00 per week in support.

Prior to the filing of his bankruptcy, Ian McLaughlin was pursued by several creditors. Default judgments were entered against him in the amount of $1,166,615 on October 15, 2002, and $247,064 on November 21, 2002. Those creditors sought to intercede in the matrimonial proceeding but that was denied by order dated April 4, 2003. *D-36*. That Order also restrained the McLaughlins from disposing of any assets, including by Property Settlement Agreement, until further order of the court.

The PSA that is the crux of this matter was signed on April 15, 2003, and was incorporated into a Judgment of Divorce of the same date. The PSA provided for the transfer by quitclaim deed of the house at 61 Highland Avenue and the land at 60 Highland Avenue to Mary McLaughlin. *D-37*. The recited consideration for those transfers was a lump sum payment of permanent alimony in the sum of $450,000[1], *pendente lite* support arrearages in the amount of $191,880, and waiver of a claim for repayment of $750,000 from the sale of the Nantucket property. *D-37 at 6-7*.

60 Highland Avenue was sold pursuant to court order for $1,300,000 in early 2004. The only evidence provided by the Trustee as to the value of 61 Highland Avenue has been ruled inadmissible. 61 Highland Avenue was listed for a sale price of $2,850,000 during the course of the matrimonial proceeding, but the only offer at the time of the commencement of the adversary proceeding had been for $2,150,000.

---

[1] That figure was arrived at by assuming a gross income to Ian McLaughlin of $200,000 a year for 10 years. That would result in an estimated $675,000 in periodic alimony payments.

Legal Analysis

A. Constructive Fraud

Counts One and Four of the Trustee's complaint are premised on the transfers being constructively fraudulent. Section 548(a)(1)(B) provides that the trustee may avoid any transfer of an interest of the debtor in property made within one year of filing if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and one of three conditions in § 548(a)(1)(B)(ii) is satisfied. The focus on the receipt of reasonably equivalent value can also be found in the state counterpart. New Jersey's Fraudulent Transfer Act provides that a transfer "is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *N.J.S.A.* 25:2-27(a). The burden of proof under either statutory section rests with the Trustee. *See*, 5 Collier on Bankruptcy ¶ 548.10, p. 548-80 (15th ed. rev. 2002)(The burden of proving a fraudulent transfer under § 548 is on the trustee); Gilchinsky v. National Westminster Bank, 159 N.J. 463 (1999)(burden to prove fraudulent transfer under NJFTA is on plaintiff).

The phrase "reasonably equivalent value" is not defined in the Code and has been left to judicial development. Although a number of different approaches have been taken, the Third Circuit has adopted the totality of the circumstances approach first promulgated by the Seventh Circuit Court of Appeals in Bundles. *See* In re R.M.L., Inc., 92 F.3d 139 (3d Cir. 1996); Barrett v. Commonwealth Federal Savings and Laon Association, 939 F.2d 20 (3d Cir. 1991). In In re Bundles, 856 F.2d 815 (7th Cir. 1988) the court eschewed a straight fair market value approach and held that "reasonable equivalence should depend

5

on the facts of each case." Id. at 824.

The way courts have applied the totality of the circumstances approach in the context of a pre-bankruptcy property settlement agreement is to attempt to ascertain what a state court would have awarded in a contested divorce proceeding. *See, e.g.*, In re Riso, 102 B.R. 280 (Bankr. D.N.H. 1989) The marital assets do not have to be evenly exchanged; "All that is required is a determination that the property settlement by the parties be within the range of a potential award in a hypothetical contested divorce proceeding." Id. at 293.

In ascertaining what might happen in a contested divorce proceeding, the bankruptcy court must examine state law as it existed at the time of the agreement. In In re Lange, 35 B.R. 579 (Bankr. E.D. Mo. 1983) the trustee sought to avoid the debtor's transfer of his one-half interest in the marital home to his former wife pursuant to a property settlement agreement. As part of the property settlement agreement the debtor's former wife had waived any claim for maintenance. The court declined to consider that waiver as "value" in determining reasonably equivalent value because under Missouri law as it existed at the time of the property settlement agreement the wife would not have been entitled to support. In a similar vein, the Trustee cites E.S.B., Inc. v. Fischer, 185 N.J. Super. 373 (Ch. Div. 1982) for the proposition that a wife's agreement to give up rights to future support is not fair consideration. The holding in E.S.B., however, was premised on the fact that the underlying agreement not to file for divorce was not enforceable under New Jersey law, it did not hinge on the fact that a claim to future support cannot be considered value under New Jersey law.

The McLaughlins situation is readily distinguishable from either Lange or E.S.B.. The PSA at issue

here was facially enforceable under New Jersey law and the parties concede that given the duration of the marriage and other factors, Mary McLaughlin would have been entitled to permanent alimony. Finally, in speculating what the matrimonial court might do, the court is strongly influenced by what that court actually did - it awarded substantial *pendente lite* support to Mary McLaughlin.

Under New Jersey law, the starting point for equitable distribution analysis is that the parties contributed equally toward the assets acquired during the marriage. *N.J.S.A.* 2A:34-23; Glass v. Glass, 366 N.J. Super. 357 (App. Div. 2004). So, for the purposes of determining if the Debtor received reasonably equivalent value, the court will presume that the matrimonial court would have awarded at least half of the total assets to Mary McLaughlin. Any alimony that Ms. McLaughlin would have been entitled to would have been in addition to that equitable distribution. Given that framework, the PSA on its face awarded a greater percentage of the assets to the Debtor than Mary McLaughlin. The court must delve behind those numbers, however, and determine if there is an accurate basis for them.

The parties each retained experts in the field of matrimonial law: William M. Laufer, Esq. for the Trustee and Karin Duchin Haber, Esq. for Mary McLaughlin. On the issue of alimony, Ms. Haber testified that there is no question that Mary would have been awarded permanent alimony and that the lump sum payout reflected in the PSA of $450,000 was conservative. Even the Trustee's expert opined that an accurate lump sum alimony figure might be as high as $300,000. Ms. Haber's assessment was persuasive given that the standard the matrimonial court would have applied is alimony sufficient to enable Mary McLaughlin to replicate a lifestyle similar to that which she enjoyed during the marriage. Lepis v. Lepis, 83 N.J. 139 (1980). Courts review the adequacy and reasonableness of support awards against the marital standard of living even when supporting a comparable lifestyle is impossible. Crews v. Crews, 164

7

N.J. 11 (2000). As has already been discussed, the parties enjoyed quite an affluent lifestyle. Concern over the affluent lifestyle was expressed by one of the Trustee's own witnesses, Michael Pallarino, Esq., the Debtor's matrimonial counsel. Mr. Pallarino testified that he was concerned about a contested divorce proceeding because of the McLaughlins' high standard of living and feared that despite the Debtor's decreased recent income that a significant alimony obligation would have been imposed. Ms. Haber also convincingly testified that alimony would not be stopped abruptly when the Debtor reached 65. She stated that in her experience courts have recognized the fact that people are living and working longer and that they take that into account when making alimony determinations. All of these factors contribute to the conclusion that the lump sum alimony award of $450,000 is within the range of what a matrimonial court might have ordered in this situation.

The next recited consideration in the PSA was the repayment of $750,000 from the sale of the Nantucket property. The Laufer expert report concludes that there is "nothing in the record that would substantiate granting Mary a $750,000 credit resulting from the sale of the Nantucket property." Mr. Laufer supports that conclusion by noting that in January 2002, the Debtor certified that most of the major improvements to the property were funded by Watson Machinery. The court does not find that fact to be dispositive. As the owner of Watson Machinery, the Debtor had full discretion regarding his compensation. So funds withdrawn from the company to fund repairs on the home were the equivalent of salary and that is a marital asset. Since the Nantucket property was acquired during the marriage, it was subject to equitable distribution. The mortgage that was paid off was a business debt of Watson Machinery. The presumption is that Ms. McLaughlin would be entitled to one half of the equity in the Nantucket property and therefore including a credit of $750,000 is reasonable.

The final recited consideration in the PSA is the $191,880 in *pendente lite* support arrears. Neither side disputes the accuracy of that figure. *Pendente lite* support awards are sometimes modified in contested divorce proceedings, however, no evidence was adduced at trial that would even remotely suggest that would have happened in this case. Mallamo v. Mallamo, 280 N.J. Super. 8 (App. Div. 1995). Therefore, the court will consider the *pendente lite* support arrears as an appropriate credit.

Having determined that the amount of credits attributed to Ms. McLaughlin in the PSA ($1,391,880) was appropriate, the court must now compare the total credits to the one half equity in 60 and 61 Highland Avenue that the Debtor relinquished. The lot at 60 Highland Avenue was sold for $1,300,000 in early 2004. After the payment of the mortgage and costs of sale, there was $1,184,000 in equity in the property. After capital gains taxes, each spouse would have been entitled to $522,000. If that figure is back dated to the date of the PSA it would even be slightly less. The court has no definitive evidence before it as for the value of 61 Highland Avenue. Although the property at one point was listed for sale at $2,850,000, the highest offer ever received on the property was $2,150,000. If the court were to take the middle range of those two numbers and deduct for mortgages and costs of sale there would have been $507,500 in equity available for each spouse. Accordingly, the total equity in the two properties that the Debtor gave up in the PSA was $1,029,500. That figure is more than $300,00 less than the amount of the credits to which Ms. McLaughlin was entitled.

The court is mindful that the assets mentioned in the PSA were not the only assets that would have been subject to equitable distribution had there been a contested divorce trial. But consideration of those other assets only strengthens the conclusion that Ms. McLaughlin received reasonably equivalent value for her interest. Ms. McLaughlin received all the personal property in the marital home, which the Trustee's

9

expert values at $250,000. That is easily offset by the fact that Ms. McLaughlin received no interest in the Debtor's 401K plan, bank account, cash surrender value of his life insurance policies and the tax returns. Overall, the court must conclude that the amount awarded to Ms. McLaughlin in the PSA was well within the range of what might have been awarded in a contested divorce proceeding, thus, it is reasonably equivalent value. Accordingly, the court finds that there was no constructive fraud and rules in Ms. McLaughlin's favor on Counts One and Four.

B. Actual Fraud

Counts Two and Three of the Trustee's complaint are premised on the transfers being actually fraudulent. The Bankruptcy Code allows transfers that occur within one year of filing to be avoided if they were made "with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). New Jersey's Fraudulent Transfer Act uses the exact same language. *N.J.S.A.* 25:2-25(a). New Jersey's statute is made applicable in bankruptcy through 11 U.S.C. § § 544.

Because direct evidence of fraudulent intent, such as an admission, is difficult to come by, New Jersey's FTA provides a list of the "badges of fraud" that are indicators of fraudulent intent. *N.J.S.A.* 25:2-26(a). Cases applying § 548(a)(1)(A) of the Bankruptcy Code rely on similar badges of fraud. *See, e.g.,* In re Enron Corp., 328 B.R. 58 (Bankr. S.D.N.Y. 2005).

The badges of fraud identified in the New Jersey statute are:

1) the transfer or obligation was to an insider;
2) the debtor retained possession or control of the property transferred after the transfer;
3) the transfer or obligation was disclosed or concealed;
4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5) the transfer was of substantially all the debtor's assets;
6) the debtor absconded;
7) the debtor removed or concealed assets;
8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*N.J.S.A.* 25:2-26(a). There are no defined number of badges that necessitate a finding of actual fraud; Conversely, the lack of badges does not categorically rule out a finding of actual fraud. Gilchinsky v. National Westminster Bank N.J., 159 N.J. 463 (1999). Nonetheless, courts have held that while one badge may be cause for suspicion, the confluence of several in one transfer is generally conclusive evidence of actual intent to defraud. Gilchinsky, at 490, citing Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F. 2d 1248, 1254 (1st Cir. 1991). Although the word "several" is not on its own particularly instructive, the facts of Gilchinsky and Sugarman do provide some guidance. In Gilchinsky the court found actual fraud based on seven badges and in Sugarman the court found fraud based on six. Gilchinsky at 478; Sugarman at 1255.

Only three badges of fraud are present here. The most obvious one is that the transfer was to an insider. While it is undeniable that the debtor's spouse qualifies as an insider, the facts that were adduced at trial do not indicate that this transfer was collusive. All indications are that this was a contested divorce proceeding. Perhaps no clearer indication of adversity is available than the Debtor's strident opposition to his wife's request for *pendente lite* support. While the court understands the Trustee's argument that the timing of the PSA in relation to the bankruptcy filing suggests that the Debtor was choosing his wife as

11

the favored creditor over his other creditors, the evidence at trial does not bear that out. The second badge of fraud that is present is that the transfer of the marital properties occurred shortly after default judgments for major debts were entered against the Debtor. The final badge of fraud that is present here is that the Debtor was insolvent after the transfers. An argument can be made that another badge is present - that the transfer was of substantially all of the Debtor's assets - but the records does not fully support that conclusion. As noted earlier, the Debtor retained a proportionally small but significant amount in assets (retirement account, life insurance policy, bank account, tax refunds). As has already been discussed, the Trustee has failed to establish what the court deems be the most crucial badge of fraud in this case - lack of reasonably equivalent value.

The badges of fraud are a guide and not a test, but based on the totality of the evidence produced at trial the court cannot find that the Trustee has sustained his burden of proof. The confluence of the badges that have been established do not inescapably lead to the conclusion that
the Debtor entered into the PSA with the actual intent to defraud creditors other than his spouse.

The court finds in Mary McLaughlin's favor on Counts Two and Three.

C. Other allegations

The Trustee's trial brief raises for the first time the argument that the April 4, 2003 Superior Court restraining order precluded the transfers at issue here and that by virtue of § 544 and § 551, the Trustee therefore has a superior position. The court will not address the merits of that contention because it was not properly pled. At no point did the Trustee seek to amend his complaint to include a count based on § 551. Substantial briefing and oral argument occurred in connection with the motion and cross-motion for summary judgment, yet the Trustee did not raise that argument at that time. Although Fed. R. Bankr.

12

Pro. 7015(b) allows pleadings to be amended to conform to the evidence under certain circumstances, that would be unjust here since Ms. McLaughlin's counsel has had no opportunity to address those issues. It has been noted that "[w]hile counsel may "clarify" a pleading through subsequent briefing, a lawyer's statement in a response brief is no substitute for adequately pleaded facts in a complaint, and a memorandum cannot provide allegations that are wholly absent from the Amended Complaint." In re PHP Healthcare Corp., 128 Fed. Appx. 839, 847 (3d Cir. 2005)  The Third Circuit has stated that a plaintiff "should not be able effectively to amend a complaint through any document short of an amended pleading." Grayson v. Mayview State Hosp., 293 F.3d 103, 109 n.9 (3d Cir. 2002).  Therefore, the court will not address those arguments.

## Conclusion

The court finds in favor of Ms. McLaughlin on Counts One through Four.  Based on that, Count Five is rendered moot.  Ms. McLaughlin's counsel should submit a form of order in accordance with this opinion.

_____
KATHRYN C. FERGUSON, USBJ
US Bankruptcy Court

DATED:    December 22, 2005